Charles J. Deacon, Appellee, v. Fidelity Mutual Life In-
surance Company, Appellant.

INSURANCE:  Deducting Loans.  A certificate of loan, the amount
of which is made lienable on a policy, is deductible from any
amount payable under the policy, when such certificate consti-
tutes the means by which the insurer, the insured, and all other
like policy holders, under a purported 20-payment life policy,
*postdated* 10 *years, and without actual payment of the first ten
premiums*, are placed in exactly the same position that they
would have been placed in had the insured annually paid the first
ten payments in cash, or had paid in cash and in a lump sum the
equivalent of said ten payments, when the postdated policy was
issued.

PRINCIPLE APPLIED:  An assessment company reorganized
as a legal reserve company, and took up a $2,000 nonreserve as-
sessment policy, which insured, then 57 years of age, had carried
for 21 years, and, in consideration of the surrender thereof,
issued a $2,000 legal reserve policy, which purported to be a
20-payment policy, and which was computed on that basis. This
last policy was postdated 10 years, and the premium, $121.74,
was the premium for an insured 47 years of age. The policy
called for 20 payments, but, in fact, exacted only 10 actual an-
nual payments subsequent to its issuance. The payments for
the postdated period were not actually paid, but were repre-
sented by a certificate of loan, signed by insured, for $876, with
6% interest from date to distribution period, 10 years hence,
which principal amount was the amount which the company
would have had in the form of a legal reserve, had the insured
paid said first ten premiums in the usual way. Profits accru-
ing on the policy were to be applied on said certificate, and the
unpaid amount thereof was made perpetually lienable on the
policy, and deductible from any amount payable thereunder.
The policy promised certain "Guaranteed Additions," provided
the insured died *within* the 10 years following the issuance of
the policy, and these additions were so graduated that, when the
amount of the loan was deducted, the beneficiary would receive
at least $2,000. At the end of the premium-paying period, 10
years, the insured, if living, was given the option to withdraw,
*"subject to any existing indebtedness,"* a cash surrender value of
$1,490, plus apportioned profits. The insured did survive said
10 years. The apportioned profits were then $315.36. The cer-
tificate of loan then amounted to $1,401.60. The insured con-
tended that the loan was deductible only in those cases where

the insured died prior to termination of the premium-paying period. He demanded $1,805.36. The company tendered $403.76. *Held*, the company was correct in its contention.

**INSURANCE: Loan Certificates.** Agreements evidencing loans 2 upon a policy need not be attached to the policy, under Section 1741, Code, 1897.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

DECEMBER 14, 1918.

REHEARING DENIED MAY 8, 1919.

ACTION to recover withdrawal value of an insurance policy. The defendant insisted on the deduction of the amount of a certificate of loan, and tendered payment of the balance. On hearing, the court entered a decree allowing the plaintiff the withdrawal value of the policy, plus the accumulated profits. The defendant appeals.—*Modified and affirmed.*

*Geo. H. Wilson* and *Tourtellot, Donnelly & Swab,* for appellant.

*Deacon, Good, Sargent & Spangler,* for appellee.

LADD, J.—The Fidelity Mutual Aid Association was organized in 1878, and its name changed by inserting therein the word, "Life," in place of "Aid," in 1884. A certificate of membership was issued to the plaintiff, August 18, 1885, stipulating for the payment of an indemnity of $2,000 to his beneficiary upon his death. This was to be raised by assessment on members, and no reserve fund was provided for. In 1899, the charter of the association was amended so as to enable the company to write legal reserve life insurance, or what is popularly known as "old line life insurance," and its name was changed to Fidelity Mutual Life Insurance Company. Plaintiff continued under his certificate of membership until 1906, when the company procured the

1. INSURANCE: deducting loans.

surrender of his certificates of membership and a policy of insurance. He had then paid on the certificate of membership, as dues and assessments, $851.30, of which $702.58 had been paid within the ten years previous. The last payment, or $21.82, appears to have applied on the first premium of the new policy, which was $121.74 annually. No other benefit appears to have been derived by him from assessments paid in obtaining the new policy, and manifestly no advantage accrued to the company therefrom, as there was no reserve. This policy, after reciting the insured's age as 47 years, stipulated for the payment of $2,000 to the insured's wife upon his death, on due proofs of loss, subject to requirements, privileges, and provisions printed thereon, and provided that:

"In the event of the death of the insured within 20 years from the second day of April, 1896, and while this policy is in force, the amount payable hereunder will be increased by guaranteed additions, making the total amount payable as follows:

| Year | | Year | |
|------|------|------|------|
| 1st  | $2082.00 | 11th | $2956.00 |
| 2d   | 2166.00  | 12th | 3024.00  |
| 3d   | 2248.00  | 13th | 3086.00  |
| 4th  | 2332.00  | 14th | 3158.00  |
| 5th  | 2414.00  | 15th | 3242.00  |
| 6th  | 2516.00  | 16th | 3324.00  |
| 7th  | 2610.00  | 17th | 3408.00  |
| 8th  | 2714.00  | 18th | 3490.00  |
| 9th  | 2796.00  | 19th | 3572.00  |
| 10th | 2876.00  | 20th | 3656.00  |

"Executed at Philadelphia, Penn., June 11th, 1906.

"[Seal]   Attest:   W. S. Campbell, Secretary.

"L. G. Fouse, President.

"O. C. Bosbyshell, Treasurer.

"Examined by Poulterer, Kean.

"This insurance is granted as of date April 2, 1896, in consideration of the application herefor, which is made a part hereof, and of the surrender and cancellation of Policy No. 8132, issued by the Fidelity Mutual Life Insurance Association, now The Fidelity Mutual Life Insurance Company, and of the payment in advance of one hundred twenty-one and 74/100 dollars, and of the payment of a like amount on or before the second day of April, in every year thereafter, until premiums for twenty years have been duly paid, or until the prior death of the insured. The premium-paying period on this policy ends on the second day of April, 1916.

"The accumulation period of this policy ends on the second day of April, 1916, when it shall share in the surplus contributed by policies of its class, according to its contribution to such surplus, as determined by the company, and this policy may then be continued or surrendered by the insured, or assigns (subject to any existing indebtedness), under one of the following

"Options.

"(1) The withdrawal of a guaranteed cash value of fourteen hundred & ninety dollars ($1,490.00), together with 'the profits apportioned hereto; or,

"(2) The conversion of the entire cash value (consisting of guaranteed cash value stated above, together with the profits) into a life annuity; or,

"(3) The withdrawal of profits in cash, and the continuation of the policy for its full amount as a paid-up participating life policy."

The application on which this policy was issued, after reciting that the plaintiff applied for insurance on his life, reads as follows:

"For $2,000 on the 20-pay life G. A. plan, the premium as stated in the policy to be payable annually. I was born on the 21 day of May, 1849, and desire policy to be issued as of age 47. Premiums to be fully paid in ten years from

April 2, '06. Make policy payable to Sylvia M. Deacon, related to me as my wife. I select the ten-year accumulation period, and I hereby agree on behalf of myself, and of any person who shall have or claim any interest in the policy issued under this application, that in the matter of distribution of surplus or profits, or the apportionment of dividends the principles and methods which may be adopted by the company for such distribution or apportionment, and its determination of the amount equitably belonging to any policy which may be issued under this application shall be and hereby are ratified and accepted."

This was followed by the statement that, in consideration of this policy, the old certificate was surrendered. At the same time, June 11, 1906, and as a part of the same transaction, plaintiff signed and turned over what is designated a certificate of loan, in words following:

"This certifies that The Fidelity Mutual Life Insurance Company, of Philadelphia, Penn., has loaned on Policy No. 188119 the sum of eight hundred and seventy-six dollars, which, with any additional loan, shall be a lien on said policy until paid; simple interest at the rate of six per cent per annum from Apr. 2, '06, to be added thereto until the end of the distribution period of said policy, at which time the profits accruing to it shall be used toward the payment of said loan, and any excess paid in cash or used as set forth in the policy, at the option of the insured. Should the profits not fully pay the loan, the amount remaining unpaid at that time may be continued as a loan with interest as aforesaid, and the dividends accruing on the policy, to be thereafter payable annually. In event of my death or failure to make any payment when due to said company before said loan is fully paid, the amount remaining unpaid shall become due and be deducted from the amount payable under said policy.

"Dated at Cedar Rapids, Iowa, June 11, 1906.

"[Signed]    Charles J. Deacon, the insured."

No copy of this certificate was attached to or endorsed on the policy, nor was this necessary. *Long v. Northwestern Nat. Ins. Co.*, 186 Iowa ——. At the end of the accumulation period, April 2, 1916, the plaintiff elected to avail himself of the first option, under which he became entitled to the payment of $1,490, together with the proportionate portion of the profits, which were $315.36, or $1,-805.36. The company deducted the amount of the certificate of loan, $1,401.60, and tendered the assured the difference, or $403.76. The sole issue is whether, as contended by plaintiff, the certificate of loan was executed as security against the exaction of the guaranteed addition in event of death in the tenth year, under the policy amounting to $876, or, as insisted by defendant, a 20-year payment policy was issued, with premiums fixed, as though it had been issued 10 years previous, plus earnings on guaranteed increase from date of policy and the difference in rates on such a policy, and merely a 10-year policy commencing where this was issued, with the stipulated options.

2. INSURANCE: loan certificates.

The actuaries computed these differences at $796, and the expense involved in exchange and issuance of the new policy at $80, and that the certificate of loan was taken to adjust this difference, and was equivalent to a cash payment of accrued premiums on the policy in the form issued. In other words, the insured was 57 years old in April, 1906. A 20-year payment policy was issued, on which payment of only 10 annual premiums of $121.74 each was exacted thereafter. As the insured's expectancy was less at 57 years than when 47 years old, the premium stipulated would be less than had the premium been computed on a policy issued at 57 years. Moreover, the options in the policy were computed on the basis of 20 annual payments, rather than 10 payments. The fact, however, that the assured was alive and healthy would

tend to reduce the cash or time payment of accrued premiums on such a policy.

It appears that the company employed White & Layton, in 1906, to procure the surrender of certificates issued by the association and the acceptance of policies of insurance in the form of that issued to plaintiff, and that J. P. Jaquith acted for that firm in procuring the application and certificate of loan. The assured testified to a conversation with this agent, over objection that the agent's authority was not shown, and that it was an attempt to vary the terms of a written contract.

"A. Mr. Jaquith came to my office. He had with him a sample copy of a policy like the one Exhibit 2, and suggested or solicited a change, and surrender of the old policy, and that I make application for the new policy. I went over the policy and accepted his proposition, and signed an application for a policy,—this application, Exhibit 3. The policy that was submitted to me was like the policy that was shown to me, Exhibit 2. Q. Now in that conversation,—or do you recall, Mr. Deacon, what the amount of the premium on the new policy was to be? A. Yes, the premium was to be $121.74 annually, but I was to be credited with the last payment on the old policy. The policy to be dated, or the premium payments thereafter to be made as to that date, April 2d. Q. And was, or was not, the last payment made by you on the old policy of $21 and some cents credited by the company upon the first premium of $121.74,—the premium for the year 1906? A. It was. I signed a promissory note at the same time that the application was taken. I signed this note that is in controversy here for $876. Q. Now what, if anything, was said by Mr. Jaquith to you at that time as to the consideration for that $876 note? A. Mr. Jaquith called my attention to the guaranteed additions in this policy, and to the fact that there was $876 already accrued, and said that the company would require that that should be made good to

them. I don't remember just the exact conversation, but it was to the effect that the $876 of accrued additions would have to be secured to the company. Referring to the policy, plaintiff's Exhibit 2, the Schedule of Guaranteed Additions, as they appear on the first page of the policy, is the guaranteed additions to which I refer. They are the same,—the sample shown me at that time was the same as these. The amount of the guaranteed additions in the tenth year, as shown by that schedule, was referred to in that conversation with Mr. Jaquith. My recollection is that the note for $876 was signed by me on the same day that the application was signed; I am not able to state the exact date. It is the same document, I think, that is set forth in the pleading of the defendant, whatever it is,—a note or certificate of some kind."

The witness testified that there was no consideration other than referred to, and that:

"In the conversation with Mr. Jaquith, I don't recall any conversation with reference to the liability on that note after April, 1906. The only conversation that I can recall is with reference to the suggestion that that had already accrued, and would have to be made good to the company. I don't recall anything said about that note and the liability thereon after the liability of the company to me on these guaranteed additions had ceased. Of course, I assumed that that would terminate it, but I don't recall that Mr. Jaquith and I had any conversation with reference to that. * * * At the time I signed the note, I believed that I was signing it in order to protect the company against the amount of that guaranteed addition of $876. Mr. Jaquith did not tell me that the note was being signed for any other purpose. I can't recollect what was said at that time with reference to the benefit or advantage I received by reason of having been a prior policy holder, further than this was the first time it had ever been suggested to me that the policy dated back."

This testimony is not contradicted, save as it appears to be inconsistent with the terms of the policy and the certificate of loan. The policy discloses that, by its terms, the guaranty for the tenth year was not available unless the insured died within ten years after the issuance of the policy; but if this had happened, then the increase of $876 would be included in the amount of the increase payable the year of his death. Thus, had he departed this life in the nineteenth year of the policy, or the ninth after its issuance, the amount payable would have been $3,572, or an increase of $1,572; but included in this would have been the $876, its guaranteed increase of the tenth year. This, then, was a legitimate item to be taken into account in computing the cash or time payment exacted in the issuance of this policy. But it does not follow, from the fact that the assured lived through the premium payment period, that no part of the cash or time payment should have been exacted. Others of the 3,500 persons to whom policies like that being considered were issued by this company at about the same date surely departed this life during the period these guaranteed increases became obligations of the company. To meet these, the assured was bound to contribute by the income earned on premiums paid, as well as increased premiums, if essential to meet the guaranteed death loss of those who died within the period of ten years following the issuance of those policies. In other words, the doctrine of averages is at the foundation of all insurance; and, in computing premiums which will enable the life companies to meet the indemnities, guaranties, and options stipulated to be paid, how long the particular individual insured actually lives is not determinative of the amount, but the average period of such a person's life, as ascertained by the life tables, demonstrated to be substantially correct by data and long experience, and the income likely to be earned from the investment of large sums of money, coming to the insurer in comparatively small

items. The mere fact, then, that the insured lived beyond the premium payment period did not indicate that the consideration of the certificate of loan had failed, nor that it could have been given only for security. As Jaquith remarked to the assured, the $876 guaranteed increase for the 10 years prior to the issuance of the policy had accrued (in event of his death during the next 10 years), and "the company would require that that should be made good to them," or, in effect, that the $876 of accrued additions would have to be secured to the company. Nothing appears to have been said as to whether other matters were taken into account in fixing the item of the cash or time advance premium. But other matters were involved, and among these were the difference between premiums exacted during the last 10 years of a 20-year policy issued at 47 years of age, and of a 10-year policy issued at the age of 57 years, and the difference required to enable the company to accord the insured the right to withdraw a guaranteed cash value of $1,490 upon the collection of 20 annual premiums, and only the last 10 of these. It requires no argument to demonstrate that these matters were of the utmost importance in fixing the cash premium or its equivalent, the certificate of loan. Moreover, the language of this certificate is inconsistent with the theory of plaintiff. Profits are to be applied on its payment, and in the event that these are insufficient, the balance is to be continued as a loan, and, upon death of the assured, is to be deducted from the amount payable under the policy. This is utterly inconsistent with the theory that the certificate was merely collateral security for the guaranteed increase in event that the insured died within the 10 years following the issuance of the policy. If the assured construed the policy and the certificate of loan as contended (he read both), he was not warranted in so doing by anything the agent said, and we find difficulty in thinking that he relied on the

certificate's being merely collateral security, as claimed; for he was a lawyer of 40-odd years' experience at the bar. However this may be, we are inclined to accord to the certificate of loan its expressed meaning, and regard its object as that manifest from the circumstances shown and the instruments connected with the transaction. The testimony of the actuary of the company is in conformity with what we have said:

"In arriving at that figure of $876, calculations were made for all the different ages that would be involved, and the reserve on the 20-payment policy at the end of the tenth year. The company was offering to give to these policy holders a 20-payment life policy, dated back ten years, and consequently with the premium payment period ending ten years later. To give such a policy in the place of an old assessment policy involved definite costs. These two propositions were not worth the same thing. If the company was giving to the old policy holders something much more valuable than the old policy, they would have to collect from him that excess value,—that difference in value. Now, a 20-payment life policy, as I have said before, is one under which premiums to insure the man for the whole of his life are to be paid within a specified period of 20 years. Under such a policy as that, it is necessary for the company to collect through those premiums considerable more than the current cost of protection, and that excess accumulates and forms a reserve which is necessary that the company should have in order that it can maintain that policy after the insured quits paying premiums. When one of these policies would be issued,—for instance when this policy in question, 188119, was issued,—it was reported to our state insurance department, for the purpose of their having to make a valuation of the policy in order to charge the company the proper liability under the policy. The liability with which the state department would charge the company would be the reserve at the end of the tenth policy year. In the case of a policy like

this, which was to be dated back ten years, the company couldn't issue and carry out a 20-payment life policy on the payment of simply the premiums for the last ten years. * * * The calculation was made to determine what would be the reserve on the 20-payment life policy at the end of the tenth year. * * * The reserve at the end of the tenth year would be $796; but in all of these reserve loan cases, the larger amount was taken in order to cover the expenses of making the change, and the necessary expenses involved in carrying on the policy. The expense of making the exchange consists of general agents employed by the company for their services. * * * It was necessary that the company collect from Mr. Deacon what would enable them to fulfill the terms and conditions of the 20-payment life policy which they were proposing to give him. Now, the previous premiums for the first ten years under this 20-payment life policy had not been paid by Mr. Deacon, but the company couldn't issue and carry out a 20-payment life policy on the payment of ten premiums. That wouldn't have been a sufficient collection to enable the company to fulfill the contract. It was not, however, necessary that we collect from Mr. Deacon ten times the premium of $121.74,—that is, collect from him $1,217.40 on account of the dating back of the policy ten years,—for the reason that, during that period of time, Mr. Deacon had a policy with the company, under which policy he had paid the cost of protection, and paid his share of the expenses of operating the business, which, in any case, would have been paid out of the premium of $121.74 per year. It was only necessary that we collect from Mr. Deacon what would put the company in just the same position as if he had originally taken the policy in 1896, and had paid the premiums during the ten years. That amount —the amount that was necessary to put the company in that position—was the reserve on the 20-payment life policy at the end of ten years: in other words, the amount which the

company would have had from him or any other policy holder at the same age who had taken a policy ten years before, and upon that basis.  Q. A 20-payment life policy with guaranteed additions?   A. Yes, this policy as it stands.  This policy with guaranteed additions has a premium, a regular premium rate for the 20-payment life policy, plus the extra premium which is included in that $121.74, to cover the extra term insurance included in the policy.  In other words, the company didn't give Mr. Deacon or any similar policy holder this extra term insurance for nothing, but charged him the proper premium rate for it.  Now, if the company had collected from Mr. Deacon only the premiums for the last ten years, $121.74 per year, it couldn't have fulfilled the contract it made with him; but, by the collection of the reserve included in the reserve loan certificate, and collecting thereafter ten annual premiums, it was in a proper position to fulfill the contract in all particulars."

The witness then stated that the certificates of loan were deposited with the insurance department of Pennsylvania, as security for a reserve exacted as security of policy holders,—in this case, the amount of $796; that the actual proportionate cost of insurance during the 10 years after the issuance of the policy was $669.82; and that to pay the surrender value of the policy of $1,490 from the premiums paid during that time would involve a loss of several hundred dollars; that, in 1906, at the age of 47, the premium on a 20-year payment policy was $95.88 for $2,000, and nearly $200 on a 10-year payment policy; that, in his computation of the cash premium to be exacted from plaintiff, he added together the reserve for the 10-year period past, amounting to $322.53 per $1,000, and the reserve for the guaranteed increase, or $75.06, making $398 for $1,000, or $796 for the $2,000; that the $121.74 annual premium was made up of $94.34 premium on the 20-year policy and $23.40 as premium for the extra insurance or guaranteed additions or increase

on the policy during the period premiums were paid. We have set out the testimony somewhat fully; for it, as we think, leads to no conclusion other than we reach.

The certificate of loan and the annual premium were fixed in pursuance of the computation of the actuary, and, though the amount is the same as the amount of the additions for the first 10 years, this appears to have been a mere coincidence.

We are of opinion that the court should have deducted the amount of the certificate from the accrued profits, plus the withdrawal value under the option, and rendered judgment for the difference, or $403.76. The judgment will be modified accordingly.—*Modified and affirmed.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.